**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-13-0000635**
**19-MAR-2014**
**08:03 AM**

NOS.
CAAP-13-0000635 and CAAP-13-0001138

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

**NO. CAAP-13-0000635**
(FC-S NO. 11-00063)
IN THE INTEREST OF DS

---

**NO. CAAP-13-10001138**
(FC-S NO. 11-00063)
IN THE INTEREST OF DS

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT

SUMMARY DISPOSITION ORDER
(By: Nakamura, Chief Judge, Leonard and Ginoza, JJ.)

In CAAP-13-0000635, Father-Appellant (**Father**) appeals from the Family Court of the First Circuit's (**Family Court's**) Decision and Order, filed on April 8, 2013.[1] In CAAP-13-0001138, Mother also appeals from the April 8, 2013 Decision and Order, as well as a May 28, 2013 order denying reconsideration, and the Family Court's Findings of Fact and Conclusions of Law (**FOFs/COLs**). The Family Court terminated Mother's and Father's (**Parents'**) parental rights to their child, DS, awarded custody of DS to the Department of Human Services (**DHS**), and ordered that DHS's Permanent Plan is in the best interests of DS.

Parents' appeals were consolidated for decision on February 5, 2014, as the appeals have common facts and issues.

---

[1] The Honorable Karen M. Radius presided.

On appeal, Father argues that the Family Court abused its discretion in terminating his parental rights for the following reasons:

(1) DHS failed to provide him with a reasonable opportunity to reunite with DS where his service plan omitted services to help him address DS's special needs;

(2) Pediatric home care nurse Penny Ontai's (**Ontai's**) testimony at the permanency hearing that DS's Mother (**Mother**) was 60% able to care for DS's special needs showed that he and Mother would become able to care for DS in the reasonably foreseeable future;

(3) He was not given a reasonable amount of time to demonstrate he could provide a safe home for DS, where he had less than two years to reunify, and DS had special needs, the service plan failed to include services to help him address those needs, and Ontai failed to schedule regular training sessions from September, 2011 to October 15, 2012; and

(4) He showed that he was willing and able to provide a safe home for DS by making significant progress in learning to care for her.

Father also argues that FOFs 57, 78-83, 85, and 90-91 are clearly erroneous.

Similarly, Mother argues that the Family Court abused its discretion in terminating her parental rights for the following reasons:

(1) DHS failed to provide her with a reasonable opportunity to reunify with DS where (a) her service plan did not recommend services that would have given her a meaningful or reasonable opportunity to do so, and (b) DHS did not provide her with tools or training to enable her to care for DS;

(2) Mother demonstrated that she was willing and able to provide DS with a safe family home where she complied with her service plan, and made significant progress in her services;

(3) Mother demonstrated that she would be willing and able to provide DS with a safe family home within the reasonably foreseeable future where pediatric home care nurse Ontai

testified that Mother was 60% able to care for DS, Mother showed great progress in her ability to care for DS, and Mother testified that she would be willing to quit her job to devote herself to caring for DS full time.

Mother also argues that FOFs 57, 58, 62, 65, 79, 80, and 90 are clearly erroneous and COLs 9-12 are wrong.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Parents' appeals as follows:

The background of this case is undisputed. Mother has a history of chronic mental health, substance abuse, and domestic violence problems, and involvement in child welfare services both as a child and as a parent. She started using marijuana at the age of thirteen and methamphetamines at the age of nineteen. She admitted to using crystal methamphetamine (**crystal meth**) six days before DS was born. She was convicted of terroristic threatening and incarcerated from 2002 to 2005. In 2005, she completed a Salvation Army substance abuse treatment program while in prison, then relapsed. Nevertheless, Mother successfully completed, among other programs, a dual diagnosis substance abuse treatment program during the course of the proceedings below and has continued to test clean on drug tests required by DHS.

Mother has three children, including DS. The older two children were adopted by different relatives when Mother's parental rights were terminated. Mother remains in contact with the older two children.

Father also has a long history of substance abuse, as well as a conviction for terroristic threatening. Father has participated in various treatment programs, but has not been able to complete all of them. At the time of trial, Father was in the HOPE Probation program. He was unemployed, but attending Honolulu Community College. Father also has three children, including two with Mother, none of whom are currently in his care.

Mother did not seek prenatal care during her pregnancy with DS. DS was born at home, then taken to the hospital, where she remained for roughly six weeks due to severe health problems. She was born with a cleft palate and a shortened chin, which resulted in feeding difficulties requiring a nasogastric tube, then a gastronomy tube. She also has been diagnosed with Down Syndrome, suffers from respiratory difficulties, chronic ear infections, vision and hearing problems, dental difficulties, a heart murmur, orthopedic problems, and other genetic abnormalities. Due to her special needs, it is anticipated that DS will require 24-hour care throughout her life.

The central issue in this appeal is whether Parents were given a reasonable opportunity to reunify with DS. HRS § 587A-2 (Supp. 2012) provides in relevant part (emphasis added):

> The policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconciliation with their families if the families can provide safe family homes, and with timely and appropriate service or permanent plans to ensure the safety of the child so they may develop and mature into responsible, self-sufficient, law-abiding citizens. The service plan shall effectuate the child's remaining in the family home, when the family home can be immediately made safe with services, or the child's returning to a safe family home. The service plan shall be carefully formulated with the family in a timely manner. Every reasonable opportunity should be provided to help the child's legal custodian to succeed in remedying the problems that put the child at substantial risk of being harmed in the family home. Each appropriate resource, public and private, family and friend, should be considered and used to maximize the legal custodian's potential; for providing a safe family home for the child. Full and careful consideration shall be given to the religious, cultural, and ethnic values of the child's legal custodian when service plans are being discussed and formulated. Where the court has determined, by clear and convincing evidence, that the child cannot be returned to a safe family home, the child shall be permanently placed in a timely manner.

HRS § 587A-4 (Supp. 2012) defines "service plan" as "a specific, comprehensive written plan prepared by an authorized agency pursuant to section 587A-27." (Emphasis added.) § 587A-27 provides the following:

> (a) The service plan shall provide:
>
> (1) The specific steps necessary to facilitate the return of the child to a safe family home, if the proposed placement of the child is in foster care under foster

custody. These specific steps shall include treatment and services that will be provided, actions completed, specific measurable and behavioral changes that must be achieved, and responsibilities assumed;

(2) Whether an ohana conference will be conducted for family finding and family group decision making;

(3) The respective responsibilities of the child, the parents, legal guardian or custodian, the department, other family members, and treatment providers, and a description and expected outcomes of the services required to achieve the permanency goal;

(4) The required frequency and types of contact between the assigned social worker, the child, and the family;

(5) The time frames during which services will be provided, actions must be completed, and responsibilities must be discharged;

(6) Notice to the parents that their failure to substantially achieve the objectives described in the service plan within the time frames established may result in termination of their parental rights;

(7) Notice to the parents that if the child has been in foster care under the responsibility of the department for an aggregate of fifteen out of the most recent twenty-two months from the child's date of entry into foster care, the department is required to file a motion to set a termination of parental rights hearing, and the parents' failure to provide a safe family home within two years from the date when the child was first placed under foster custody by the court, may result in the parents' parental rights being terminated; and

(8) Any other terms and conditions that the court or the authorized agency deem necessary to the success of the service plan.

(b) Services and assistance to the family that are required by a service plan shall be presented in a manner that can be understood by and does not overwhelm the parties.

(c) The court shall ensure that each term, condition, and consequence of the service plan has been thoroughly explained to, understood by, and agreed to by each member of the child's family whom the authorized agency deems to be necessary to the success of the service plan. The court shall thereafter order the service plan into effect and order the distribution of copies to each family member or person who is a party to the service plan. If a member of a child's family whom the authorized agency deems to be necessary to the success of the service plan cannot understand or refuses to agree to the terms, conditions, and consequences of the service plan, the court shall conduct a hearing to determine the terms, conditions, and consequences of a service plan that will ensure a safe home for the child.

(Formatting altered; emphasis added.)

Here, Parents argue that they were not provided with a reasonable opportunity to reunify with DS where their service plans did not indicate that they were required to demonstrate they could address DS's medical needs, and the service plans did not include medical-therapeutic training, which was necessary for them to assume the responsibility for DS's care.

Although it was decided at a 2/2/12 'Ohana Conference that Parents would participate in weekly medical-therapeutic training, and DHS considered the training to be a requirement for reunification, DHS never amended the 10/13/11 Service Plan to indicate what specific steps DHS required Parents to take, what outcomes DHS expected, and the consequences if Parents failed to realize those outcomes, all of which are required by HRS § 587A-27. The record on appeal reveals that from the time the 10/27/11 Service Plan was issued to the 10/3/12 termination hearing, Parents complied with the services indicated in the plan and may not have understood the significance of the medical-therapeutic training and what DHS expected of them with regard to it. The 10/27/11 Service Plan did not address, in any way, DS's special needs.

On November 29, 2011, Mother completed parenting education with PARENTS, Inc., and on January 26, 2012, she completed outreach counseling through Catholic Charities Comprehensive Counseling and Support Services (**CCSS**). Through those services, it appears that Mother learned basic child-rearing skills, rather than how to address DS's special medical needs. On December 27, 2011, Father completed PARENTS, Inc.; then, he declined outreach services and his case was closed. Like Mother, it appears that he learned through his services basic child-rearing skills, rather than how to address DS's special medical needs.

All parties agreed at the 6/28/12 Pretrial Hearing that Parents had complied with the 10/27/11 Service Plan. However, reports and testimony subsequently submitted reflected that DHS, DS's court-appointed child advocate, and the service providers did not perceive that Parents had demonstrated that they were

able to provide DS with the necessary level of care, given her complex medical conditions.

Mother's testimony at the 10/3/12 termination hearing suggests that she failed to appreciate the significance of the requirement to train with Ontai, what the expected outcomes were, what were her responsibilities, and what was her role relative to Ontai and Foster Mother. Ontai's schedule was irregular and based primarily on DS's needs. Although there was some attempt by Ontai to overlap with Mother's limited visitation schedule, there is no evidence in the record that Mother was informed of or failed to attend any scheduled training concerning DS's special needs.

The DHS social worker's testimony at the termination hearing underscores DHS's failure to properly inform Parents of their obligations with regard to the medical-therapeutic training. She testified that Parents' failure to demonstrate they could address DS's medical needs was an important factor in her decision to recommend terminating parental rights, yet she never amended the 10/27/11 Service Plan to include the medical-therapeutic training, appeared at any training sessions, or told Parents she was concerned about their inability to tube-feed DS. Apparently, the social worker assumed that Parents would realize what their obligations were through her conversations with them, and their participation at the 2/2/12 'Ohana Conference, among other things. However, neither her conversations nor the other sources of information she mentioned would have informed Parents of their obligations or expected outcomes with the degree of specificity required of a statutorily-compliant service plan. See HRS § 587A-27.

After the 10/3/12 termination hearing, it appears that Parents understood they were expected to meet with Ontai each week, and Mother, at least, knew that she was supposed to demonstrate she could care for DS the way that Ontai and Foster Mother did during visits. Nevertheless, the 10/27/11 Service Plan still was not amended to provide specific expectations and outcomes.

In addition, other factors that clearly contributed to the Family Court's decision were not addressed in the service plans. For example, Mother's housing situation in public housing, as a caretaker for Grandmother, with potential exposure to a visiting uncle who was identified as a possible threat to the child, was identified as "unclear" in the Decision and Order, but Mother was never informed that she needed to secure alternative housing arrangements and no assistance was provided to that end. Mother's full-time job was referenced as indicative of Mother being unrealistic about how she would provide competent care for DS; yet her employment, including positive work reviews and a promotion, was clearly a positive demonstration of her "clean" lifestyle. Mother testified that she would be willing to quit her job, or presumably work less, if she had an opportunity to care for DS. No goals, expectations, or achievable outcomes for Mother's work-versus-child-care time management were addressed, or even raised, in any service plan.

Given the foregoing, we conclude that the service plans provided to Parents were not fair, appropriate, and comprehensive, and, accordingly, FOF 91 (which found that the service plans were fair, appropriate, and comprehensive) is clearly erroneous.

A thorough review of the record's many reports and recommendations, including prior to DHS's motion for termination of Parents' parental rights and permanent placement, but especially after the filing of DHS's motion, tends to show that efforts to provide Parents with the clear goals and the services necessary for a possible reunification with DS were lacking, notwithstanding Parents' significant and sustained progress in virtually all of the identified "Tasks for Parents" that were set forth in the service plans.

We note however, that neither Mother or Father contested their service plans. As noted in In re Doe, 100 Hawai'i 335, 344, 60 P.3d 285, 294 (2002), "a claim for additional services and accommodations must be timely made." Even assuming Mother and Father were somehow hampered in their

ability to ask for assistance, they were represented by counsel who could have notified DHS on their behalf. Id.

Further, notwithstanding the deficient service plans, we must conclude that the record before the Family Court was replete with evidence constituting clear and convincing evidence satisfying the HRS § 587A-33(a) (Supp. 2012) criteria, and therefore warranting, *inter alia*, the termination of Parents' parental rights pursuant to HRS § 587A-33(b) (Supp. 2012). DS is a particularly medically-fragile child whose vulnerability and special needs are complex, and still emerging as she gets older. Her 24-hour-a-day care not only involves heightened observational skills and specialized techniques for feeding, bathing, and a high-level of support for her development, psychological, medical, and dental needs, but also interaction with a complex regimen of doctors and other professional care providers that are needed to provide DS with the best possible quality of life. While Parents have made tremendous personal progress, including their sustained sobriety and educational and vocational achievements, their historical and repeated problems with substance abuse, their criminal histories, Mother's uncertain housing situation, Mother's psychological and cognitive assessment, Mother's history of abuse as a child, the potential threats to DS in Mother's living situation, the circumstances involved in the removal of DS and her two siblings from Mother's care, and Parents' lack of the kind of well-developed support system that would provide an adequate safety net for them and DS, support the Family Court's findings and conclusions that Parents are not able to provide DS with a safe family home, even with the assistance of a service plan, and it is not reasonably foreseeable the Parents will be able to provide DS with a safe family home, even with the assistance of a service plan, within a reasonable period of time. See HRS § 587A-7 (safe family home factors). Virtually all members of the multi-disciplinary team that participated in DS's care and the assessment of Parents' abilities to provide DS with a safe family home, including medical professionals, DS's guardian ad litem, and the DHS social

worker, were in agreement that Parents were not able to provide DS with a safe family home, even with the assistance of a service plan, and that it is not reasonably foreseeable the Parents will be able to provide DS with a safe family home, even with the assistance of a service plan, within a reasonable period of time. See also HRS § 587A-7 (Safe Family Home Factors). Stated differently, we cannot conclude that the service planning caused substantial prejudice to Mother or Father. In re Doe, 100 Hawai'i at 343, 60 P.3d at 293; Hawaii Family Court Rules, Rule 61.

Father and Mother were given a reasonable amount of time to demonstrate they could provide for DS. DHS was not required to provide two full years to reunify; rather, two years is the outside limit for reunification. HRS § 587A-339(a)(2) (Supp. 2012); In re Doe, 89 Hawai'i 477, 492, 974 P.2d 1067, 1082 (App. 1999). Neither parent provides any authority for the contention that, under the circumstances of this case, the Family Court was required to give them additional time to reunify in light of DS's special needs, and/or due to the inadequacies of the service plans, and we find none.

DHS delayed filing its termination motion for nearly ten months to give Parents more time to engage in services, despite the existence of aggravated circumstances (see HRS §§ 587A-4 (Supp. 2012) & -28(e)(4) (Supp. 2012)); the Family Court continued the termination hearing twice so Parents could have more time for medical-therapeutic training and ultimately gave them nearly two years to reunify; and by the time of the final termination hearing, Parents were still unable to demonstrate their ability, individually or collectively, to care for DS.

For these reasons, we conclude that the Family Court did not abuse its discretion in terminating Parents' parental rights. The Family Court did not clearly err by finding that Parents were unable to provide DS with a safe home, even with the assistance of a service plan, and would not become able and willing to do so in the reasonably foreseeable future.

Accordingly, the Family Court's April 8, 2013 Decision and Order is affirmed.

DATED: Honolulu, Hawai'i, March 19, 2014.

On the briefs:

Herbert Hamada
for Father-Appellant

Patricia A. Brady
for Mother-Appellant

Mary Anne Magnier
Kurt Jamie Shimamoto
Deputy Attorneys General
State of Hawai'i
for Petitioner-Appellee

Chief Judge

Associate Judge

Associate Judge

11